**IN THE COURT OF APPEALS OF IOWA**

No. 18-0840
Filed August 15, 2018

**IN THE INTEREST OF B.D. and N.D.,**
**Minor Children,**

**S.H., Mother,**
      Appellant.

_____

      Appeal from the Iowa District Court for Jones County, Deborah Farmer

Minot, District Associate Judge.


      A mother appeals the termination of her parental rights to her two children.

**AFFIRMED**.



      Craig Elliott, Anamosa, for appellant mother.

      Thomas J. Miller, Attorney General, and John B. McCormally, Assistant

Attorney General, for appellee State.

      Jessica L. Wiebrand, Cedar Rapids, guardian ad litem for minor children.



      Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

A mother appeals the termination of her parental rights to her two children. She challenges the ground for termination found by the juvenile court, contends termination is not in the best interests of the children, and requests an additional six months to work toward reunification.

**I.   Backgrounds Facts and Proceedings**

The children in this case, B.D. and N.D., were born in 2004 and 2006, respectively.   The mother and children previously lived in Montana.[1]  They came to the attention of the Montana Department of Public Health and Human Services (MDHS) in November 2006, when one-year old B.D. was found outside of their home, alone, and only wearing a shirt and shorts in forty-degree weather.   A passerby discovered B.D. and learned the doors to the home were locked.  No one appeared when they knocked and pounded on the door.  Once law enforcement and a social worker entered, the mother was found inside sleeping and was difficult to awaken.

Multiple attempts at subsequent home visits by MDHS were unanswered despite the presence of the mother's car at the house or the sound of a television or the children inside.   The children were found to be overdue on their immunizations, and the mother was frequently reminded to get them updated by public health officials.  In April 2007, when the mother finally brought the children

---

[1] The children's father had been incarcerated in Montana for approximately one year at the time of the termination hearing.  His projected parole date is May 2020.  He ended his involvement in the children's lives shortly after N.D.'s birth.  Other than a short period when the children were young and lived with the father in Hawaii, he was not involved in their lives.  He testified he had not seen the children for over a year and a half.

to a doctor to update their immunizations, N.D. had multiple bruises on her hips, ribcage, back, and arm, as well as bite marks. The mother claimed she failed to notice these despite giving the child a bath earlier that day. During the ensuing investigation by MDHS, an x-ray showed N.D. also had a recent collarbone fracture. This injury would have been painful, so the child would have showed signs of being hurt and experiencing difficulty using her right arm. However, the mother claimed she was not aware of the injury or how it occurred. The children were subsequently removed from parental care due to concerns of physical abuse and neglect. During the removal period, the older child, B.D., exhibited behaviors in play therapy which the therapist believed resulted from an unstable environment. Another specialist noted B.D. was developmentally delayed in all areas tested, exhibited aggressive behavior, and became easily frustrated. This was especially prevalent after a supervised visit with the mother. The children were returned to the mother in April 2008. The record does not provide details about the return and what steps the mother undertook to have the children returned to her care.

Further incidents were reported and investigated in May, June, and August 2008; February and April 2009; April 2012; May 2015; and March 2016. The report in 2016 was not fully investigated as the whereabouts of the mother were unknown. The mother moved to Iowa at some point after the initiation of the investigation.[2]

In July 2016, the children and the mother came to the attention of the Iowa Department of Human Services (DHS) when law enforcement responded to a welfare check of an unconscious woman in a vehicle. The mother was arrested

---

[2] The record reflects that none of the information from Montana was shared with the Iowa Department of Human Services until August 2017 and with the court until October 2017.

on felony drug charges after officers found methamphetamine and items consistent with the sale of drugs in her possession. During a search of the vehicle, the officers also found marijuana residue and used and unused syringes. Officers also observed visible track marks on the mother's fingers and arm. An allegation of denial of critical care was subsequently made against the mother.

During DHS's investigation, the mother admitted she was under the influence during times she cared for the children as she was their primary caregiver. The children reported to DHS that the mother was often not at home and they had no way to contact her. This left the children fending for themselves. Additionally, the mother and children lived with the mother's stepfather, who was often found intoxicated and at the bar beneath their apartment, yet he was frequently left as the caretaker for the children. In August, DHS determined the report of denial of critical care and the failure to provide proper supervision was founded. The mother agreed to voluntary services.

In September, the mother was arrested during a traffic stop. She initially provided false identification information to the police, but after discovering her true identity, the police discovered her license was suspended. She was also found to be in possession of drug paraphernalia. These charges were later dismissed. In October, the mother was involved in an altercation at the bar beneath her apartment. After the police intervened, they discovered she had an outstanding warrant and arrested her. She was also charged with child endangerment and possession of marijuana. In November, the mother pled guilty to a charge of possession of methamphetamine with intent to deliver for the July arrest. Additionally in November, the mother was charged with criminal mischief and theft.

Case progress notes show the children were found with lice on multiple occasions, missed many days of school, and spent most evenings away from the home, going to the library until it closed or to their friends' homes. The mother often slept for long periods of time or left the home for days without providing contact information or her whereabouts to the children or their caretaker. The children were essentially parenting themselves, which included getting themselves ready for and to school.

On December 21, the State filed a petition to adjudicate the children as children in need of assistance (CINA). Sometime during December, the mother reported to DHS that she wished to take the children to Missouri as she had a job opportunity and housing prospect there through a friend. During this conversation, both children tried to share their wish not to move, but the conversation became emotional, and the mother sent the children to their rooms. Sometime in late December, the mother left for Missouri with the children without informing anyone. Within a month, the children, without the mother, were found back at their old house with the mother's stepfather. The children reported the environment in Missouri was unsafe and the mother's job prospect did not work out. The record does not reflect when the mother returned from Missouri.

The mother failed to attend the pretrial conference on the CINA petition scheduled for January 20, 2017, and her and the children's whereabouts were unknown at that time. She also failed to appear at pretrial conferences on her pending criminal charges, so warrants were issued.

In February, the State requested the children be removed from the mother's care given her use of drugs and her lack of supervision or care for the children. At

the time the children were removed, her whereabouts were unknown. She continued to leave the children with others, including her stepfather, whose ability to supervise was of concern as he did not always know where the children were and he was frequently found intoxicated. On February 9, the court ordered the children's temporary removal and placement into foster care. At a hearing on February 17, the mother did not resist the continued removal and stipulated to the CINA adjudication. During a medical examination after removal, the children were again found to have lice.

The mother was arrested on February 11 and was in jail during the February hearing. In March, she was released under the supervision of the department of corrections. The record reflects she ultimately received a suspended sentence and probation on the felony methamphetamine offense. She was ordered to complete substance-abuse and mental-health evaluations and treatment. She resolved her remaining criminal cases in June, receiving suspended sentences and probation on each charge.

After the children's removal, the mother's initial involvement with DHS was minimal. Attempts at contact were difficult—either she failed to respond or failed to respond in a timely manner. Reports indicate the children adjusted well to the foster home and were doing well. The mother's visitation with the children improved for a time, but she failed to follow through on services relating to her substance-abuse and mental-health issues as well as obtaining employment, despite reporting to both her children and DHS that she was completing and attending those services. Reports indicate visitation fluctuated between positive

and negative and when asked about the family's history with Montana protective services, the mother denied MDHS was involved.

In July, the mother was arrested on possession and theft charges. She eventually pled guilty. In August, she was placed in a community corrections facility, the Hinzman Center in Cedar Rapids, where she tested positive for marijuana upon admittance. She was jailed as a result of testing positive again in November and subsequently sentenced to fifty-five days in jail for contempt of court. She declined visitation while in jail and returned to the Hinzman Center. In February 2018, she was jailed for a probation violation for failing to maintain employment, after losing her job for allegedly stealing a jacket while at work. The incarcerations resulted in her restarting the Hinzman Center program three times.

In March, the mother completed a psychological evaluation, in which she failed to disclose information about her positive drug tests, criminal history, and her involvement with MDHS. In April, the State petitioned to have the parents' parental rights to both children terminated, as neither parent had progressed with case-plan expectations and the children had been removed from parental care for over a year with no trial periods at home. The permanency goal until this point had been reunification.

Following a termination hearing, the juvenile court terminated the parental rights of both parents pursuant to Iowa Code section 232.116(1)(f) (2018). Only the mother appeals.

## II.    Standard of Review

Termination proceedings are reviewed de novo. *In re A.S.*, 906 N.W.2d 467, 472 (Iowa 2018). The court is not bound by the lower court's fact findings,

"but we do give them weight, especially in assessing the credibility of witnesses." *Id.* "Our primary concern is the best interests of the child." *In re J.E.*, 723 N.W.2d 793, 798 (Iowa 2006)

**III.    Analysis**

As noted, the mother challenges the statutory grounds for termination, contends termination is not in the best interests of the children, and requests an additional six months to work toward reunification. We will address these issues in turn.

A.    Statutory Grounds for Termination

The juvenile court terminated the mother's parental rights pursuant to section 232.116(1)(f), which provides termination may be ordered where there is clear and convincing evidence the children: (1) are four years of age or older; (2) have been adjudicated CINA; (3) have been removed from the physical custody of the parent for at least twelve of the last eighteen months; and (4) cannot be returned to the custody of the parent at present time. "At the present time" has been interpreted to mean "at the time of the termination hearing." *See In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).

The mother does not contest the establishment of the first three elements but challenges whether the fourth element has been established by clear and convincing evidence. She focuses her arguments on the progress she has made at the Hinzman Center and in achieving the goals of the permanency plan.

At the time of the termination hearing, the children had been removed from the mother's care for over a year. The mother was living in a community corrections facility which did not allow children. She had no planned discharge

date, though she was optimistic she would graduate and be released within a month or two. However, the juvenile court questioned her honesty and the record reflects the mother has often failed to be honest about her past and present. She failed to notify DHS about her past interactions with protective services in Montana regarding the same children. She also failed to disclose this information along with her criminal history during her psychological evaluation. She often told the children and her worker that she was engaged in a variety of programs, but she failed to follow through with those programs. Only recently has the mother taken steps to progress in her treatment. Given the mother's history of dishonesty, it remains to be seen whether those steps will be successful.

Even if the mother is released from the Hinzman Center when she hopes to be, she has not arranged housing for her or the children. She has not consistently held employment during the pendency of this case and only recently began a new job. Additionally, despite the mother's progress, she has not progressed beyond fully supervised visits with the children in the year since the children were removed from her care. Further, the mother conceded in her testimony at the termination hearing that the children could not be returned to her care at that time. We therefore conclude the State met its burden under section 232.116(1)(f) to show that the children could not be returned to the mother's care at the time of the termination hearing.

B. Best Interests

The mother argues termination is not in the children's best interests, contending there is a bond between her and the children. "As a general rule, when the statutory grounds for termination of parental rights have been proved, the

termination of parental rights is in the best interests of the children. However, there is no all-encompassing best interest standard that can resolve any particular case." *In re C.M.*, No. 14-1140, 2015 WL 408187, at *3 (Iowa Ct. App. Jan. 28, 2015). Instead, the court must "give primary consideration to the child[ren]'s safety, to the best placement for furthering the long-term nurturing and growth of the child[ren], and to the physical, mental, and emotional condition and needs of the child[ren]." Iowa Code § 232.116(2). The court may consider if the "child[ren] ha[ve] become integrated into the foster family" and "whether the foster family is able and willing to permanently integrate the children into the foster family." *Id.* § 232.116(2)(b).

At the time of the termination hearing, N.D. was twelve years old and B.D. was about to turn fourteen. They have both been removed from their mother's care for over a year. Both have formed bonds with their mother, and evidence was presented that the children do love their mother. But the mother struggles to handle many of the children's behaviors and becomes overwhelmed. She has failed to act as a parent in the past, often leaving the children in the care of inappropriate caregivers or to parent themselves. And, despite the mother's consistent visitation, she has not progressed to an increased number of visits or a lower level of supervision. Her visits have remained fully supervised.

Despite the services provided to the mother, both here in Iowa during the pendency of this case and previously in Montana, the mother has failed to demonstrate an ability to provide a stable and safe home. She only recently has made some progress in addressing some of her issues. "Children are not equipped with pause buttons; delaying the children's permanency in favor of a parent is contrary to the children's best interests." *In re L.K.*, No. 18-0576, 2018

WL 3060277, at *3 (Iowa Ct. App. June 20, 2018). The children have been in the care of the same foster family since the time of their removal from their mother's care in February 2017. The children have bonded with the foster parents and are doing well. The foster parents seek to adopt the children. We therefore agree with the juvenile court's finding that termination is in the best interests of the children.[3]

C.    Extension

The mother also requests additional time to allow her to work toward reunification. Section 232.104(2)(b) affords the juvenile court the option to continue placement of a child for an additional six months if the court finds "the need for removal . . . will no longer exist at the end of the additional six-month period."

We commend the mother on her recent success. However, as the court recognized in its ruling, "[e]ven if [the mother] were released immediately and made consistent progress—which she has never done—it would take more than six months before [DHS] would be willing to consider a trial home placement." We hope the mother is successful in this attempt at sobriety, but we are not interested in playing with the children's progress and stability. *See In re A.A.*, No. 15-0399, 2015 WL 2089761, at *3 (Iowa Ct. App. May 6, 2015). The structure of the Hinzman Center has provided a measure of stability for the mother, but such stability has not translated to the mother's progress with relation to the children. While her visits with the children were often positive, the mother has not

---

[3] The mother does not argue any statutory exceptions to termination under section 232.116(3) apply. Therefore we do not address them. *See In re P.L.*, 778 N.W.2d 33, 40 (Iowa 2010) (identifying that if a party does not dispute a particular step in the three-step termination framework, appellate courts need not address the issue).

progressed beyond fully supervised visits.  She struggles to manage the children if they misbehave, leading to the mother becoming overwhelmed.

The mother only recently started a new job before the termination hearing.  Though the court recognized that she "appears to be off to a good start," her employment history before this was not long-lasting or stable.  The mother has not lived on her own either during the pendency of this case or in Montana.  She had no identified plans for housing at the time of the termination hearing, as her discharge from the facility is not yet known.  While the mother did complete a psychological evaluation in March, she failed to disclose her criminal history and involvement with child protective services while in Montana.

"A child should not be forced to endlessly await the maturity of a natural parent."  *In re C.K.*, 558 N.W.2d 170, 175 (Iowa 1997).  The pendency of this case, in conjunction with the time and services provided during the mother's involvement with child protective services in Montana, indicates the mother waited too long to respond to the efforts and services provided to her.  These children have waited a long time for permanency.  "[A]t some point, the rights and needs of the children rise above the rights and needs of the parent."  *In re C.S.*, 776 N.W.2d 297, 300 (Iowa Ct. App. 2009).  That point was reached in this case. We find additional time is not warranted.  We affirm the juvenile court's order terminating the mother's parental rights.

**AFFIRMED**.